NOT FOR PUBLICATION                                                                    (Docket No. 8)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

_____
                                                          :
FRANK MacWILLIAMS, trading as         :
Edgewater Park Amoco and                   :
Mac's Amoco,                                          :
                                                          :
            Plaintiffs,                              :   Civil No. 09-1844 (RBK /AMD)
                                                          :
        v.                                                :   **OPINION**
                                                          :
BP PRODUCTS NORTH                           :
AMERICA, INC.,                                    :
                                                          :
            Defendant.                             :
_____:

**KUGLER**, United States District Judge:

This matter comes before the Court on a motion by Defendant BP Products North America, Inc. ("BP") to dismiss the Complaint of Plaintiff Frank MacWilliams, trading as Edgewater Park Amoco and Mac's Amoco, for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Complaint brings claims under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, et seq., and the common law of New Jersey. For the reasons expressed below, the Court will grant BP's motion in part and deny it in part. The Court will also grant Plaintiff an opportunity to amend.

1

I.      BACKGROUND[1]

Plaintiff Frank MacWilliams owns and operates two New Jersey gasoline service stations known as "Edgewater Park Amoco" and "Mac's Amoco."  On December 13, 2000, Mr. MacWilliams entered into Dealer Supply Agreements ("DSAs") with BP's predecessor-in-interest, Amoco Oil Company.[2]  The DSAs governed many aspects of the franchise relationship, including the supply of fuel.  These agreements obligated Amoco (and later BP) to supply Amoco-branded gasoline and petroleum products to Mr. MacWilliams's gas stations.  The price to be paid by Mr. MacWilliams for fuel was set at the "[s]upplier's dealer buying price for Dealer's brand . . . in effect for Supplier's pricing area . . . ."  (DSA ¶ 3(a).)  The supplier retained the right to change prices for all products at any time with ordinary notice to Mr. MacWilliams.  (Id.)  In case of assignment, the DSAs authorized the assignee to establish pricing.  (DSA ¶ 3(b).)

In a separate writing executed the same day, Mr. MacWilliams and Amoco agreed that Mr. MacWilliams would be entitled to End-of-Month volume allowances (the "EOM Program").  The EOM Program required Amoco to pay Mr. MacWilliams anywhere from one to four cents per gallon of Amoco-branded gasoline sold by Mr. MacWilliams at his gas stations.  The more gasoline Mr. MacWilliams sold, the greater the per-gallon allowance.  This agreement contained a provision authorizing Amoco to cancel the EOM Program, with thirty days notice, "if in the opinion of Amoco competitive conditions no longer warrant payment."  As part of the

---

[1] The facts in this section are drawn from the allegations in Plaintiff's Complaint as well as from exhibits attached thereto.  See Green v. NCO Inovision, No. 09-410, 2010 WL 147934, at *1 (D.N.J. Jan. 11, 2010) (district court may consider exhibits attached to the complaint when considering a Rule 12(b)(6) motion to dismiss).

[2] The original DSAs governed the franchise relationship for a period of five years.  In 2005, BP renewed the DSAs for an additional five years.

agreements, Mr. MacWilliams was required to supply a security deposit in the amount of $80,000, which he paid in the form of credit letters ($60,000) and cash deposits ($20,000).

Mr. MacWilliams's gas stations prospered. Mr. MacWilliams attributes his success to a strategy of aggressive gasoline pricing whereby he offered gasoline to the consuming public at the lowest price available for name-brand gasoline in the area. Mr MacWilliams would not be able to pursue this pricing policy profitably without the existence of the EOM Program.

On August 21, 2008, BP advised Mr. MacWilliams that it was assigning its supply responsibilities under the DSAs to a third-party jobber known as Ocean Petroleum, LLC ("Ocean"). At this time, Mr. MacWilliams was also notified that Ocean intended to invoke its right to cancel the EOM Program. Mr. MacWilliams, who was not interested in being supplied by Ocean, told BP that he regarded the assignment as a termination of the DSAs. Subsequently, Mr. MacWilliams entered into a supply agreement with a different fuel supplier.

In September of 2008, Mr. MacWilliams informed BP of this alternate arrangement and requested the return of his $80,000 security deposit. BP returned the letters of credit but advised Mr. MacWilliams that it had already transferred the cash deposits to Ocean. Upon request, Ocean refused to return the security deposit. Ocean considered the cash deposit partial consideration for allowing Mr. MacWilliams to pursue his new supply arrangement.

On April 20, 2009, Mr. MacWilliams filed a Complaint against BP alleging that the assignment to Ocean, and Ocean's subsequent termination of the EOM Program, constituted a constructive termination of his franchise in violation of the PMPA. The Complaint further alleges a breach of contract resulting in economic loss attributable to the cessation of the EOM Program and Ocean's refusal to refund the cash portion of the security deposit.

## II. STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss an action for failure to state a claim upon which relief can be granted. With a motion to dismiss, "'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

In making this determination, a court must engage in a two part analysis. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009); Fowler, 578 F.3d at 210-11. First, the court must separate factual allegations from legal conclusions. Iqbal, 129 S. Ct. at 1949. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Second, the court must determine whether the factual allegations are sufficient to show that the plaintiff has a "plausible claim for relief." Id. at 1950. Determining plausibility is a "context-specific task" that requires the court to "draw on its judicial experience and common sense." Id. A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. See id.

## III. DISCUSSION

BP argues that the Complaint fails to state a claim cognizable under PMPA. BP further argues that Plaintiff's contract claim predicated upon the cancellation of the EOM Program is preempted. Finally, BP argues that Plaintiff's contract claim predicated upon Ocean's failure to

4

return the $20,000 cash deposit fails to satisfy the jurisdictional amount required by 28 U.S.C. § 1332.  The Court will address each argument in turn.

      A.      **PMPA Claim**

BP argues that Plaintiff does not state a claim cognizable under the PMPA.

Congress enacted the PMPA in 1978 to prohibit the "arbitrary or discriminatory termination or non-renewal" of franchise agreements between large petroleum refiners and distributors (referred to as "franchisors") and the smaller retailers and distributors of their products (referred to as "franchisees").  S. Rep. No. 95-731, at 15 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 874; see 15 U.S.C. § 2801 (defining terms).  Congress was concerned that franchisors wielded too much bargaining power vis-a-vis franchisees.  S. Rep. No. 95-731, at 17 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 876.  Specifically, Congress believed that franchisors were threatening to terminate or fail to renew these agreements in order to force compliance with the franchisor's preferred marketing policies.  Id.

The PMPA generally prohibits a franchisor from terminating a franchise or failing to renew a franchise relationship.  15 U.S.C. § 2802(a).  A "franchise" is a creation of Congress consisting of three elements: (1) permission to occupy leased marketing premises; (2) the right to sell fuel under a refiner's trademark; and (3) the right to be supplied with such fuel.  See 15 U.S.C. § 2801(1); Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., Nos. 86-4748, 86-5107, 1990 WL 61787, at *4 (D.N.J. May 9, 1990).  A "franchise relationship" is defined as "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise."  15 U.S.C. § 2801(2).  To terminate a franchise or fail to renew a franchise relationship, the franchisor must

give proper notice and base termination or non-renewal on an enumerated statutory ground. 15 U.S.C. § 2802(b). By crafting the statute in this way, Congress sought to "protect a franchisee's reasonable expectation of continuing the franchise relationship while at the same time insuring that distributors have adequate flexibility . . . to respond to changing market conditions and consumer preferences." Patel v. Sun Co., 63 F.3d 248, 250 (3d Cir. 1995) (quoting S. Rep. No. 95-731, at 19 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 877) (internal quotations omitted).

In this case, the Plaintiff does not allege that his franchise has actually been terminated or non-renewed. Rather, Plaintiff alleges that the assignment to Ocean – and Ocean's subsequent decision to terminate the EOM Program – has worked a constructive termination of his franchise.

The PMPA does not expressly provide a cause of action for constructive termination. Neither the Supreme Court nor the Third Circuit has officially endorsed such claims. Nevertheless, a number of other circuit courts have interpreted the PMPA as authorizing constructive termination claims. See, e.g., Marcoux v. Shell Oil Prods., Co., 524 F.3d 33, 46 (1st Cir. 2008), cert. granted, 129 S. Ct. 2788, 2789 (2009); Barnes v. Gulf Oil Corp., 795 F.2d 358, 362-63 (4th Cir. 1986); May-Som Gulf, Inc. v. Chevron U.S.A., Inc., 869 F.2d 917, 922-25 (6th Cir. 1989); Beachler v. Amoco Oil Co., 112 F.3d 902, 906-07 (7th Cir. 1997); Fresher v. Shell Oil Co., 846 F.2d 45, 47 (9th Cir. 1988) (per curiam); Shukla v. BP Exploration & Oil, Inc., 115 F.3d 849, 852-53 (11th Cir. 1997).

Claims for constructive termination have frequently arisen in the context of a franchisor's assignment of franchise agreements to third-party jobbers.[3] Not all franchise agreement

---

[3] Constructive termination claims have also arisen where a franchisor presents a franchisee with a new set of franchise agreements and indicates that the franchisee must "take it or leave it." E.g., Meyer v. Amerada Hess Corp., 541 F. Supp. 321, 329 (D.N.J. 1982).

6

assignments will give rise to a claim of constructive termination.  See 15 U.S.C. § 2806(b) (permitting assignment of franchise agreements in accordance with state law). Many courts agree, however, that an assignment can work a constructive termination in certain situations, namely where the assignment (1) results in a breach of one of the three statutory components of the franchise agreement or (2) violates state law.  See, e.g., Marcoux, 524 F.3d at 46; May-Som Gulf, Inc., 869 F.2d at 922; Beachler, 112 F.3d at 906-07.

Despite this common starting ground, courts have struggled to define the precise contours of a constructive termination claim.  The Sixth Circuit takes the position that constructive termination claims under the PMPA may not proceed absent a complete deprivation of one of the three franchise components.  See May-Som Gulf, Inc., 869 F.2d at 923; Clark v. BP Oil Co., 137 F.3d 386, 391-92 (6th Cir. 1998).  This rule purports to respect the balance Congress sought to create through enactment of the PMPA by providing "important but limited protections" and leaving many potential contractual breaches to state law.  Clark, 137 F.3d at 391 (citing Beachler, 112 F.3d at 904).

In this case, Mr. MacWilliams continues to operate his gas stations under the Amoco trademark, and his supply of Amoco-branded gasoline has not been shut-off.  Indeed, the Complaint does not allege that Ocean ever intended to discontinue supply of gasoline to him. Rather, it makes clear that Ocean intended to continue supplying Mr. MacWilliams with Amoco-branded fuel, albeit at a higher real cost.  Thus, it is clear that the Complaint would not state a claim under the Sixth Circuit standard.

Plaintiff instead urges the Court to follow the more liberal position adopted by those circuits that do not require franchisees to sustain a complete loss of a franchise element before

bringing suit under the PMPA. See, e.g., Marcoux v. Shell Oil Prods., Co., 524 F.3d 33, 46 (1st Cir. 2008) ("[T]he breach of the statutory element of the franchise does not have to be a total breach."), cert. granted, 129 S. Ct. 2788, 2789 (2009); Barnes v. Gulf Oil Corp., 795 F.2d 358, 362-63 (4th Cir. 1986) ("A franchisor cannot circumvent the protections the [PMPA] affords a franchisee by the simple expedient of assigning the franchisor's obligation to an assignee who increases the franchisee's burden by charging more for gasoline than the stipulated franchise price.").

The question of whether a constructive termination claim can be predicated on a partial loss of one of the three core benefits of a franchise agreement is currently before the Supreme Court. See Mac's Shell Serv., Inc. v. Shell Oil Prods. Co., -- U.S. --, 129 S. Ct. 2788, 2789 (2009) (granting petition for writ of certiorari); Brief of Shell Oil Products Company LLC, Motiva Enterprises LLC, and Shell Oil Company at i, Mac's Shell Serv., Inc. v. Shell Oil Prods. Co., Nos. 08-240, 08-372 (2009) (articulating question presented). The Court is cognizant that the interests of judicial economy and efficiency for the parties weigh heavily against the Court taking sides at this juncture. That being said, the Court will not stay the instant motion because its disposition does not require resolution of the question before the Supreme Court.

This is so because Plaintiff's Complaint fails to state a claim even under the more liberal standards articulated in Marcoux and Barnes. Plaintiff apparently reads these cases to stand for the proposition that a franchisor constructively terminates a franchise anytime the assignee subsequently increases a franchisee's costs for any of the three essential components. Critically, this reading overlooks the fact that the courts rendering those decisions were operating under the assumption that the assignee raised the price in a contractually unauthorized manner.

In Marcoux, for example, a franchisee brought a constructive termination claim predicated on an assignee's cancellation of a contract establishing a subsidy program that granted the franchisee rebates based on volume of sales. 524 F.3d at 37-38. Although the subsidy contract authorized the assignee to unilaterally terminate the program with thirty days notice, numerous representations were made to the franchisees that the subsidy program, or something like it, would always exist and that the cancellation provision was only to be utilized in extreme situations such as war or an oil embargo. Id. at 38. The First Circuit held that the cancellation worked a breach of the franchise agreement.[4] Id. at 45. Citing Barnes with approval, the court observed that a statutory element of the franchise is breached when an assignment results in a price increase "above the price specified in the contract." Id.; see also Barnes, 795 F.2d at 362 (constructive termination claim is viable on the theory that assignee raised prices above the "stipulated franchise price").

It strikes the court as fundamental that a franchise, which after all is nothing more than a statutorily limited contractual relationship, cannot be constructively terminated by conduct that is in fact authorized by the underlying contracts. Marcoux and Barnes are not the only cases to emphasize this point. In Shukla, for example, a plaintiff-franchisee brought a constructive termination claim against BP for assigning its franchise to a third-party jobber, who subsequently increased the plaintiff's cost of fuel by eliminating BP's supply pricing structure. 115 F.3d at 853. The plaintiff's supply contract contained an open price term and provided that BP could

---

[4] To ultimately prevail on a constructive termination claim, the First Circuit would also require a plaintiff to prove that the breach of a core component of the franchise agreement "was such a material change that it effectively ended the lease . . . ." Marcoux v. Shell Oil Prods., Co., 524 F.3d at 33, 46 (1st Cir. 2008), cert. granted, 129 S. Ct. 2788, 2789 (2009).

change the price of fuel at any time.  Id.  The Eleventh Circuit held that the elimination of the supply pricing structure did not breach the supply component of the franchise agreement by reasoning that the franchisee had no contractual right to insist on a certain price.  Id. at 853-54; see April Mkt. & Distrib. Corp. Inc. v. Diamond Shamrock Refining and Mkt. Co., 103 F.3d 28, 30 (5th Cir. 1997) (holding that there cannot be a constructive termination under the PMPA where an assignee's actions did not breach any obligation it owed to the franchisee); Clark, 137 F.3d at 392 (observing that a franchisee should not be heard to argue that an assignee-initiated price increase constructively breached the supply component of a franchise where the assignee did nothing to the franchisee that the franchisor could not have done to him in the first place).

      The Plaintiff in this case does not allege an entitlement to a certain real supply price.  The DSAs contain an open price term for fuel to be set by the franchisor and grant the franchisor the right to change price at any time.  The DSAs also provide that third-party jobbers retain the right to establish prices upon assignment.  (DSA ¶ 3.)  Moreover, the agreement giving rise to the EOM Program authorized the franchisor to unilaterally cancel the program if it was no longer warranted by competitive conditions.  Thus, far from constituting a breach, the plain language of the contracts underlying Plaintiff's franchise appears to explicitly authorize Ocean's planned EOM Program cancellation.

      Reevaluation of the franchise agreements in light of New Jersey law does not change this result.  The fuel contracts between the parties are governed by the Uniform Commercial Code ("UCC"), which New Jersey has codified at N.J. Stat. Ann. §§ 12A:2-101, et seq.  See N.J. Stat. Ann. § 12A:2-102 (contracts for sale of goods governed by UCC).  Every contract governed by the UCC "imposes an obligation of good faith in its performance or enforcement."  N.J. Stat.

Ann. § 12A:1-203.  Moreover, in New Jersey, every contract is subject to an implied covenant of good faith and fair dealing as a matter of common law.  <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 690 A.2d 575, 587 (N.J. 1997).  This obligation applies equally to "contracts that contain express and unambiguous provisions permitting either party to terminate the contract without cause."  <u>Id.</u>

In New Jersey, the focus of the good faith inquiry hinges upon proof of proper motive.  <u>Wilson v. Amerada Hess Corp.</u>, 773 A.2d 1121, 1130 (N.J. 2001).  To demonstrate a lack of good faith, a plaintiff must show that the party has exercised its discretionary authority "arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract."  <u>Id.</u>  "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance."  <u>Id.</u>  Thus, a party that is expressly granted unilateral discretion does not act in bad faith by exercising that discretion to create a result within the range of risks contemplated by the parties at the time of the agreement.  <u>Id.</u> at 1127 (citing Steven J. Burton, <u>Breach of Contract and the Common Law Duty to Perform in Good Faith</u>, 94 Harv. L. Rev. 369 (1980)).

In this case, the Complaint alleges that the availability of the EOM Program induced Mr. MacWilliams to enter into the franchise agreements, and as such, constituted a material term.  The Complaint further alleges that the existence of the EOM Program played a role in the development and success of Mr. MacWilliams's high volume business model.  Importantly, however, the Complaint does not allege that Ocean cancelled the EOM Program for an improper reason.  For example, he does not allege, as the plaintiffs did in <u>Marcoux</u>, that Ocean cancelled the EOM Program in an attempt to run him out of business and convert his service stations to its

control. The Complaint contains no allegations even suggesting that Ocean exercised its contractual right to cancel the EOM Program for any reason outside the contemplation of the parties at the time of signature. As a result, the Complaint does not support the theory that the duty of good faith and fair dealing prohibited cancellation of the EOM Program. Absent such a breach, the underlying contracts make clear that Ocean could set price and cancel the EOM Program with notice. Plaintiff admits that such notice was given. Accordingly, the Court concludes that Plaintiff has not pleaded a breach of the franchise agreement sufficient to trigger PMPA protection and thus does not state a claim.[5]

### B. Breach of EOM Program Contract

Mr. MacWilliams also brings a state law breach of contract claim to recover the money lost as a consequence of Ocean's cancellation of the EOM Program  To this end, the Complaint alleges that "[a]s a result of [BP's] material breaches and termination of the Agreements, the plaintiff has suffered damages in the form of its loss of the cash portion of its security deposit

---

[5] Plaintiff does not argue that the assignment itself worked a constructive termination by virtue of violating New Jersey law. New Jersey permits contractual assignments in the absence of an express agreement to the contrary. See Aronsohn v. Mandara, 484 A.2d 675, 679 (N.J. 1984) ("If the contract contains no prohibition on assignment, such rights may be assigned in the absence of any public policy reason to the contrary."). Section 2-210 of the UCC, which New Jersey has adopted, permits assignments, inter alia, where doing so would not increase materially the burden or risk imposed on the other party. See Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., Nos. 86-4748, 86-5107, 1990 WL 61787, at *7 (D.N.J. May 9, 1990). As noted, the contractual relationship between the parties expressly contemplates assignment to a third-party jobber. (DSA ¶ 3(b).) No contractual provision expressly prohibits assignment. Moreover, the assignment to Ocean does not appear to have materially increased the risk imposed upon Mr. MacWilliams by the contracts. Under either supplier, Plaintiff bore the same risk, to wit, that competitive conditions would change in such a way as to cause his supplier to invoke its unilateral right to cancel the EOM Program. In any event, the Complaint does not plead facts suggesting otherwise. Accordingly, the Court concludes that the Complaint does not allege that the assignment violated New Jersey law.

and the loss of the End of Month Allowance as provided for in the Agreements." (Complaint ¶ 33.) BP argues that this claim is preempted by the PMPA because the Complaint states that the material breaches occurred in the context of what Plaintiff believed was the constructive termination of his franchise.

The PMPA preempts certain state law claims relating to the termination of a franchise or the non-renewal of a franchise relationship. See 15 U.S.C. § 2806(a)(1). State laws relate to the termination of a franchise where they "regulate the 'grounds for, procedures for, and notification requirements with respect to termination' . . . ." O'Shea v. Amoco Oil Co., 886 F.2d 584, 592 (3d Cir. 1989) (citation omitted). Accordingly, "PMPA only preempts state laws that limit the permissible substantive reasons that a petroleum franchisor can terminate a franchisee." Id. In other words, "when state law claims are 'intimately intertwined' with the termination or nonrenewal of a franchise they are preempted by the PMPA." Kehm Oil Co. v. Texaco, Inc., 537 F.3d 290, 299 (3d Cir. 2008).

BP's preemption argument is misplaced and stems from an overly cramped reading of the Complaint. The Complaint clearly alleges that BP has materially breached its contractual agreements. This allegation articulates a breach of contract. Thus, the allegation that these material breaches occurred in the context of what Plaintiff considers to be a constructive termination is of little consequence. This is especially so in light of the Court's conclusion that the Complaint states no such claim.[6] Congress intended the PMPA "to create a uniform system

---

[6] In this sense, BP's preemption argument is somewhat disingenuous. On the one hand, it asks the Court to dismiss the PMPA claim for failure to allege a termination within the meaning of PMPA. On the other, it asks the Court to dismiss the contract claim because it is intimately intertwined with a termination. As noted, the Court agrees with BP that the Complaint does not allege a termination within the meaning of the PMPA. Thus, it follows that Plaintiff's

of franchise termination, not a uniform system of contract law." O'Shea, 886 F.2d at 593. The Senate Report on the PMPA does not refer to any congressional intent to preempt the common law of contracts, "even to the extent that it may become involved in a PMPA action." Id. Thus, the Court does not agree with BP that the PMPA preempts Plaintiff's contract claim.

That being said, so much of Plaintiff's contract claim that is predicated upon loss of the EOM Program must nonetheless be dismissed. As noted, Plaintiff has not alleged a violation of a contractual right to the continued existence of this program. This leaves for consideration Plaintiff's contract claim based on Ocean's failure to return his $20,000 cash deposit.

### C. Breach of Contract for Failure to Return Security Deposit

BP argues that Plaintiff's contract claim based on Ocean's failure to refund his $20,000 cash deposit must be dismissed because it does not satisfy the amount in controversy required for diversity jurisdiction. The Court disagrees.

If the jurisdictional basis of this case rested exclusively on 28 U.S.C. § 1331, the Court might be inclined to dismiss the remaining portion of Plaintiff's contract claim by declining to exercise supplemental jurisdiction.[7] In this case, however, Plaintiff also asserts jurisdiction based

---

breach of contract allegations cannot arise in relation to a PMPA termination. In other words, BP may not have it both ways.

[7] Where a court has original jurisdiction over a claim, the court also has supplemental jurisdiction over related claims that "form part of the same case or controversy . . . ." 28 U.S.C. 1367(a). The Court may decline to exercise supplemental jurisdiction, however, if it has dismissed the claim over which it had original jurisdiction. 28 U.S.C. § 1367(c). The Third Circuit has instructed that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (quoting Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) (internal quotation marks omitted)).

on the diversity of the parties pursuant to 28 U.S.C. § 1332.  Diversity jurisdiction remains intact here because both parties are citizens of different states and the Complaint appears to claim damages in excess of the jurisdictional limit in good faith.  See Bell v. United Auto Group, Inc., No. 05-2262, 2006 WL 1798746, at *3 (D.N.J. June 28, 2006) (citing Packard v. Provident Nat. Bank, 994 F.2d 1039, 1045 (3d Cir. 1993)) ("The face of the complaint determines jurisdiction if the claim appears to be made in good faith . . . .").  The fact that the only remaining claim is worth less than $75,000 is of no consequence.  See Nationwide Mut. Fire Ins. Co. v. T & D Cottage Auto Parts and Serv., Inc., 705 F.2d 685, 687 (3d Cir. 1983) ("[I]n a diversity case events occurring subsequent to the filing of the complaint that reduce the amount in controversy below the statutory limit do not oust the court's jurisdiction.").  As a result, dismissal of Plaintiff's contract claim based on Ocean's failure to return its security deposit is inappropriate.

        **D.**     **Leave to Amend**

Although the parties do not address the issue, the Court will consider whether leave to amend the Complaint should be granted.

"[A] court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility." Carter v. Fairbanks, No. 09-4032, 2009 WL 2843882, at *2 (D.N.J. Sept. 1, 2009) (citing Grayson v. Mayview State Hosp., 293 F.3d 103, 110-11 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir. 2000)).  On the facts made known to the Court, and without the benefit of the parties' input on the matter, the Court can discern no good reason to refuse to grant leave to amend.  A proper amendment within a short period of time will work no hardship on BP, which remains a defendant in this matter regardless.  Moreover, an amendment would not necessarily be

futile.  Although the Complaint does not allege a contractual right to the continued receipt of EOM allowances or that Ocean cancelled program in violation of law or contract, neither does it foreclose the possibility that an amendment will cure these deficiencies.  Thus, the Court will grant Plaintiff ten days to amend the Complaint in conformity with this opinion.

### IV.     CONCLUSION

For the foregoing reasons, BP's motion to dismiss the Complaint will be granted as to Plaintiff's PMPA claim and as to his contract claim predicated on breach of the EOM Program contract.  The Court will deny BP's motion to dismiss Plaintiff's contract claim predicated upon the failure to return the cash security deposit.  The Court will further grant Plaintiff ten days to amend the Complaint.  An accompanying Order shall issue today.


Dated: 2-3-2010                                                         /s/ Robert B. Kugler
                                                                        ROBERT B. KUGLER
                                                                        United States District Judge