NOT FOR PUBLICATION (Doc. No. 21)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| FRANK MacWILLIAMS (trading as Edgewater Park Amoco and Mac's Amoco), | |
| Plaintiff, | Civil No. 09-1844 (RBK/AMD) |
| v. | **OPINION** |
| BP PRODUCTS NORTH AMERICA INC., | |
| Defendant. | |

**KUGLER**, United States District Judge:

This matter arises out of several fuel supply agreements between Plaintiff Frank MacWilliams and Defendant BP Products North America Inc. ("BP"). Pursuant to the agreements, BP agreed to supply fuel to two gasoline stations owned and operated by Plaintiff. Plaintiff claims that BP breached the agreements and violated the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, et seq., by assigning the agreements to a third-party that immediately raised fuel prices and terminated a monthly rebate program. This matter comes before the Court pursuant to BP's motion for summary judgment dismissing the Amended Complaint. Because Plaintiff consents to judgment dismissing his PMPA claim, the Court grants BP's motion for summary judgment regarding that claim. As discussed below, the Court grants in part and denies in part BP's motion for summary judgment regarding Plaintiff's breach-of-contract claims.

I.      BACKGROUND

Plaintiff owns and operates two New Jersey gasoline service stations known as "Edgewater Park Amoco" and "Mac's Amoco."  In December 2000, Plaintiff entered into Dealer Supply Agreements ("DSAs") with BP's predecessor-in-interest, Amoco Oil Company ("Amoco").  The original DSAs had five-year terms.  In 2005, BP renewed the DSAs for an additional five years.  The renewed DSAs gave Plaintiff the option of terminating the contracts before their expiration by paying a $30,000 early termination fee for each station.

The DSAs governed many aspects of the franchise relationship, including the supply of fuel.  They required BP to supply BP-branded gasoline and petroleum products to Plaintiff's gas stations.  According to the DSAs, BP set the price for fuel at the "dealer buying price . . . in effect for [Plaintiff's] pricing area", but BP could "change prices for all products at any time." (DSA § 3(a)).  The DSAs also provided that BP may assign its rights under the agreements and that the assignee may change fuel prices.  Section 3(b) of the agreements provided:  "If this Agreement is assigned by [BP] to a [BP] jobber or other party, the price to be paid by [Plaintiff] for motor fuel and other products hereunder will be as established by said jobber or other party." (DSA § 3(b)).  The DSAs further required Plaintiff to provide a security deposit in the amount of $80,000, which he paid in the form of letters of credit ($60,000) and cash ($20,000).

In separate writings executed at the same time as the corresponding DSAs, Plaintiff and Amoco agreed that Plaintiff would be entitled to End-of-Month Volume Allowances (the "EOM Agreements").  The EOM Agreements required Amoco (and later BP) to pay Plaintiff a certain amount per gallon of gasoline that Plaintiff sold at his gas stations.  The more gasoline Plaintiff sold, the greater the per-gallon allowance.  The EOM Agreements contained a provision authorizing BP to unilaterally cancel the End-of-Month Volume Allowances "at any time."

2

(EOM Agreement, at 2). If BP terminated the allowances, the agreements required BP to give Plaintiff 30 days written notice.

Plaintiff's gas stations prospered under its arrangement with Amoco and BP. Plaintiff attributes his success to a strategy of aggressive gasoline pricing whereby he offered gasoline to the consuming public at the lowest price available for name-brand gasoline. According to Plaintiff, he could not afford to offer this pricing without BP's payments under the EOM Agreements.

Plaintiff's troubles with BP began in August 2008 when BP advised him that it had assigned the DSAs to third-party jobber Ocean Petroleum, LLC ("Ocean"). According to a declaration from BP's Northeast Regional Sales Manager, Jeffrey C. Burrell, BP also advised Plaintiff at that time "that it was exercising its rights under the EOM Agreements to cancel the EOM Program, as BP typically does when assigning supply contracts to third parties." (Decl. of Jeffery C. Burrell dated Apr. 9, 2010, ¶ 13). BP does not contend, nor submit any evidence, that it gave Plaintiff written notice regarding termination of the EOM Program. Plaintiff asserts in his declaration that "BP never provided [P]laintiff with the required written notice that the EOM allowances would be cancelled." (Decl. of Frank MacWilliams dated May 3, 2010, ¶ 14). Plaintiff admits, however, that in August 2008 Ocean notified him that it was terminating the End-of-Month Volume Allowances. (Id. ¶ 15). Plaintiff provides no evidence regarding when payments under the EOM Agreements actually ended. Plaintiff did not consent to BP's assignment of the DSAs to Ocean or the termination of the End-of-Month Allowances.

Upon learning that BP assigned the DSAs to Ocean, Plaintiff told BP that he did not wish to receive fuel from Ocean. Plaintiff claims that "[i]n virtually all cases in which BP has assigned supply contracts to Ocean, including mine, Ocean has engaged in unfair and inequitable

3

conduct with the dealers, such as terminating EOM allowances [and] threatening to charge dealers up to twenty cents a gallon over the rack rate if the dealer did not enter into ten year supply agreements rather than standard five year agreements." (Id. ¶ 16). Thus, rather than accept fuel from Ocean under the DSAs and the EOM Agreements, which allowed Ocean to raise fuel prices and terminate the allowance program, Plaintiff chose to negotiate a supply contract with another BP jobber, Arfa Enterprises, Inc. ("Arfa"). Plaintiff claims that "Ocean insisted that [he] and [Arfa] pay it $200,000 so that [Plaintiff] could be relieved of the contractual obligations that BP has assigned to Ocean, and Arfa and [Plaintiff] did so, under duress". (Id. ¶ 18). Plaintiff also claims that he tried to terminate the DSAs by paying BP the $30,000 early termination fee, but BP refused to accept the fee or the termination.

After Plaintiff secured Arfa as his fuel supplier and paid Ocean to be released from the DSAs, he requested that BP return his security deposit. BP returned the $60,000 in letters of credit, but, according to Mr. Burrell, BP had already transferred the $20,000 cash deposit to Ocean as part of its assignment of the DSAs. (See Decl. of Jeffery C. Burrell dated Apr. 9, 2010, ¶ 17). Plaintiff states in his declaration that when he asked Ocean for the deposit, Ocean told him to "get it from BP." (Decl. of Frank MacWilliams dated May 3, 2010, ¶ 20).

Plaintiff filed his Complaint against BP in April 2009. The Complaint alleged that BP's assignment of the DSAs to Ocean and the termination of the EOM Agreements constituted a constructive termination of Plaintiff's franchise in violation of the PMPA. The Complaint also asserted a common law contract claim based on BP's termination of the EOM Agreements and refusal to return Plaintiff's cash deposit. In lieu of filing an Answer, BP moved to dismiss the Complaint. On February 3, 2010, this Court granted BP's motion to dismiss Plaintiff's PMPA claim under Rule 12(b)(6). See MacWilliams v. BP Prods. N. Am., Inc., No. 09-1844, 2010 U.S.

Dist. LEXIS 8967, at *16 (D.N.J. Feb. 3, 2010).  The Court held that because the DSAs and the EOM Agreements allowed the franchisor to set fuel prices and to terminate the EOM Agreements, Plaintiff could not argue that his franchise was constructively terminated by either a price increase or termination of the EOM Agreements.  Id. at * 18-20.  The Court denied BP's motion in so far as it sought to dismiss Plaintiff's breach of contract claim based on the return of Plaintiff's security deposit, but granted BP's motion in so far as it sought to dismiss Plaintiff's breach of contract claim based on BP's termination of the EOM Agreements.  Id. at * 20-24.  The Court nevertheless granted Plaintiff ten days to amend his Complaint to allege facts sufficient to establish a contractual right to continued receipt of the End-of-Month Volume Allowances.

Plaintiff timely filed an Amended Complaint on February 12, 2010.  The Amended Complaint alleges that BP made oral representations to him that the EOM Agreements "would remain in existence."  (Am. Compl., ¶¶ 11, 19).  BP also allegedly told Plaintiff that if the EOM Agreements were terminated, Plaintiff "would be permitted to terminate its [DSAs]."  (Id. ¶ 11).  In reliance on those oral representations and the expected income from the End-of-Month Volume Allowances, Plaintiff claims to have spent approximately $750,000 in capital improvements to his service stations.  The Amended Complaint reasserts claims for constructive discharge of the franchise in violation of the PMPA and breach of contract based on BP's "conduct in terminating the Agreements."  (Id. ¶ 39).

BP now moves for summary judgment regarding all of Plaintiff's claims.  After this Court ruled on BP's motion to dismiss and after Plaintiff filed his Amended Complaint, the Supreme Court issued its decision in Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC, 130 S. Ct. 1251 (2010).  The Supreme Court held in Mac's Shell that "a necessary element of any

5

constructive termination claim under the PMPA is that the complained-of conduct forced an end to the franchisee's use of the franchisor's trademark, purchase of the franchisor's fuel, or occupation of the franchisor's service station." Id. at 1261-62. In light of this ruling, Plaintiff admits that Mac's Shell "vitiates [his] PMPA claims in this case," and he "consents to judgment against [him] on Count One of [his] Amended Complaint." (Pl. Br. at 4-5). Plaintiff nevertheless opposes BP's motion regarding his breach of contract claim.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, the Court is not to make credibility determinations regarding witness testimony. Sunoco, Inc. v. MX Wholesale Fuel Corp., 565 F. Supp. 2d 572, 575 (D.N.J. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

However, to defeat a motion for summary judgment, the nonmoving party must present competent evidence that could be admissible at trial. See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995). The nonmoving party "may not rest upon the mere allegations or denials of" its pleadings and must present more than just "bare assertions, conclusory allegations or suspicions" to establish the existence of a genuine issue of material fact. Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982) (citation omitted); see also Fed. R. Civ. P. 56(e). "A party's failure to make a showing that is 'sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial' mandates the entry of summary judgment." Watson v. Eastman Kodak Co., 235 F.3d 851, 857-58 (3d Cir. 2000) (quoting Celotex Corp., 477 U.S. at 322).

## III. DISCUSSION

Plaintiff opposes BP's motion for summary judgment based on four breach-of-contract theories. The Court addresses each of Plaintiff's theories in turn.

### A. Assignment of the DSAs

Plaintiff first claims that BP's assignment of the DSAs to Ocean was invalid because the Uniform Commercial Code ("UCC") prohibits assignments that "increase materially the burden or risk imposed on" the other party. N.J.S.A. 12A:2-210 (adopting § 2-210 of the UCC).

The parties do not dispute, and this Court previously ruled, that the fuel supply contracts between the parties are governed by New Jersey's version of the UCC, N.J.S.A. 12A:2-210, et seq. See MacWilliams, 2010 U.S. Dist. LEXIS 8967, at *16. The UCC provides that "unless otherwise agreed, all rights of either [party]. . . can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance." N.J.S.A. 12A:2-210.

The DSAs do not prohibit, and in fact provide, that BP may assign its rights to a third-party. Plaintiff nevertheless argues that Ocean's threatened price increases and termination of the EMO Agreements imposed an increased risk and impaired Plaintiff's chance of obtaining the bargained for return. Plaintiff's argument is unavailing.

First, the DSAs did not fix or guarantee Plaintiff's fuel price. In fact, the DSAs expressly permitted BP to "change prices for all products at any time." (DSA § 3(a)). Moreover, the

7

DSAs provided that "[i]f this Agreement is assigned by [BP] to a Supplier jobber or other party, the price to be paid by [Plaintiff] for motor fuel and other products hereunder will be established by said jobber or other party." (DSA § 3(b)). Thus, Plaintiff cannot argue that Ocean's threatened price increases would "materially increase his burden" under the DMAs because the DMAs expressly allowed for price increases. Second, Plaintiff cannot argue that Ocean's termination of the EOM Agreements materially affected his burdens and risks because the EOM Agreements expressly permitted BP to terminate the End-of-Month Volume Allowances "at any time." (EOM Agreements, at 2).

In short, BP's assignment to Ocean was not invalid under the UCC because the assignment created no new risks or burdens. See Beachler v. Amoco Oil Co., 112 F.3d 902, 908 (7th Cir. 1997) (analyzing assignment of fuel supply contract under UCC § 2-210 and concluding that assignment was valid notwithstanding assignee-supplier's price increase because contract expressly allowed for price increase); Clark v. BP Oil Co., 137 F.3d 386, 393-94 (6th Cir. 1998) (holding that "open price term" in fuel supply contract estopped plaintiff from arguing that assignee's price increase amounted to "material change in the risks and burdens imposed on him" under UCC § 2-210). Therefore, Plaintiff's breach-of-contract theory based on BP's assignment to Ocean fails, and BP is entitled to summary judgment regarding this claim.

### B. Termination of the EOM Agreements

Plaintiff's next breach-of-contract theory is that BP's termination of the EOM Agreements amounts to a breach of the parties' verbal agreement. BP responds that the parol evidence rule bars this claim.

In general, the parol evidence rule "prohibits the introduction of evidence that tends to alter an integrated written document." [1] Conway v. 287 Corporate Ctr. Assocs., 901 A.2d 341, 346 (N.J. 2006). However, the New Jersey Supreme Court does not strictly apply the parol evidence rule. See Atl. N. Airlines, Inc. v. Schwimmer, 96 A.2d 652, 655-56 (N.J. 1953). Under New Jersey law, courts should "consider all of the relevant evidence that will assist in determining the intent and meaning of the contract." Conway, 901 A.2d at 346. This requires "a thorough examination of extrinsic evidence in the interpretation of contracts." Id. "Such evidence may include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." Id. (internal quotation marks and citations omitted). Notwithstanding this relaxed approach to the parol evidence rule, the New Jersey Supreme Court has held:

> The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing--not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said.

Schwimmer, 96 A.2d at 655-56. A court should therefore exclude parol evidence "[s]o far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing". Id.

Here, Plaintiff attempts to introduce parol evidence of "an intention wholly unexpressed in the writing." Id. Even if BP made the alleged oral promises, the parties subsequently reduced their agreement to writing. Those writings, which Plaintiff signed, permit BP to terminate the

---

[1] "The parol evidence rule is a matter of substantive law." Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 662 (3d Cir. 1990) (citing Betz Lab., Inc. v. Hines, 647 F.2d 402, 405 (3d Cir. 1981)). Thus, in this case, the Court must apply New Jersey's parol evidence rule regarding the EOM Agreements. Id.

9

End-of-Month Volume Allowances "at any time." (EOM Agreements, at 2). Nowhere do the agreements say or suggest that BP agreed not to terminate the allowances. New Jersey's parol evidence rule prohibits Plaintiff from rewriting the terms of the parties' agreement by introducing evidence of prior oral discussions that directly contradict the agreements' terms.[2] Thus, termination of the EOM Agreements did not, in and of itself, constitute a breach of the parties' agreement because that agreement, as stated in the EOM Agreements, permitted BP to terminate the allowance program.

### C. BP's Failure to Comply with the EOM Agreements' Notice Provisions

Plaintiff next argues that BP breached the EOM Agreements because it did not provide 30 days written notice of termination.

A breach-of-contract claim under New Jersey law requires proof of three elements: "a valid contract, defective performance by the defendant, and resulting damages." Coyle v. Englander's, 488 A.2d 1083, 1088 (N.J. Sup. Ct. App. Div. 1985). To prove resulting damages, a plaintiff must prove that he suffered a quantifiable loss that was "the natural and probable consequences" of the defendant's breach. Totaro, Duffy, Cannova and Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 921 A.2d 1100, 1108 (N.J. 2007). The New Jersey Supreme Court has interpreted this standard to require proof that the plaintiff's alleged damages were "a reasonably certain consequence of the breach" at the time the parties contracted. Id.

Under the EOM Agreements, BP could terminate the End-of-Month Volume Allowances at "any time." If BP exercised that termination right, the EOM Agreements required BP to give Plaintiff 30 days written notice. BP presents no evidence that it gave Plaintiff written notice, and

---

[2] Indeed, Plaintiff admits that his "breach of contract [claim] relates to this [oral] agreement by BP to pay EOM allowances, and this claim is not based on the language of the supply agreements." (Pl. Br., at 7).

Plaintiff states is his declaration that BP did not give him written notice. Thus, on the evidence before the Court, it appears that BP breached the agreements' notice provisions.

However, in addition to presenting evidence of a breach, Plaintiff must also present evidence of resulting damages. See Coyle, 488 A.2d at 1088. Plaintiff seeks damages for the loss of the End-of-Month Volume Allowances, his $750,000 in capital improvements to the stations, the $200,000 paid to Ocean, and his $20,000 cash deposit. Yet, he presents no evidence proving that BP's failure to provide 30 days written notice caused any of his alleged losses. In fact, although Plaintiff did not receive written notice, he admits that Ocean gave him verbal notice that it was terminating the End-of-Month Volume Allowances sometime in August 2008, and, based on that notice, Plaintiff obtained a new supply contract with Arfa sometime during or before September 2008. (Am. Compl. ¶ 25). Thus, within a month of receiving actual notice of the termination, Plaintiff obtained a new contract. Because Ocean and BP could terminate the End-of-Month Volume Allowances at any time, and because Plaintiff received actual notice of the termination and promptly obtained a new contract, there is no evidence that BP's failure to provide written notice caused Plaintiff any loss.

Nevertheless, because the EOM Agreements require BP to give Plaintiff 30 days notice regarding termination of the End-of-Month Volume Allowances, Plaintiff may be entitled to one month of allowances if BP stopped payment without providing the required notice. However, Plaintiff does not provide any evidence showing when Ocean or BP stopped paying him under the agreements. If Ocean made one final monthly payment after providing verbal notice of the termination, then Plaintiff did not suffer any loss as a result of the breach of the notice provision. On the evidence before the Court, however, there is no basis to conclude that Plaintiff suffered a loss because Plaintiff does not provide any evidence showing when BP or Ocean ceased paying

11

the allowances. Plaintiff cannot survive summary judgment regarding this claim. See Watson, 235 F.3d at 857-58 ("A party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial' mandates the entry of summary judgment.").

### D. Plaintiff's Security Deposit

Plaintiff's final breach-of-contract theory is that BP breached the DSAs by failing to return his $20,000 cash deposit once the DSAs were terminated. BP claims that it did not breach the DSAs because it transferred the $20,000 to Ocean when it assigned Ocean its rights under the agreements.

As noted above, a breach-of-contract claim under New Jersey law requires proof of three elements: "a valid contract, defective performance by the defendant, and resulting damages." Coyle, 488 A.2d at 1088. In general, an assignment of contractual rights "does not discharge the original [promisor], but merely transfers the duty to the assignee as an additional obligor." Fusco v. Union City, 618 A.2d 914, 916-17 (N.J. Sup. Ct. App. Div. 1993) (citing 15 Williston on Contracts § 1867A (3d ed. 1972)). "A party 'cannot relieve himself of the obligations of a contract without the consent of the obligee.'" Id. at 337 (quoting Riley v. New Rapids Carpet Center, 294 A.2d 7, 10 (N.J. 1972)). "There must be a 'clear and definite intention on the part of all concerned' that it is the purpose of the agreement to substitute a new debtor for the old one." Id. (quoting Tolland v. Lista, 134 A.2d 601, 603-04 (N.J. Sup. Ct. App. Div.1957).

Here, Plaintiff not did consent to BP's assignment of the DSAs to Ocean. Thus, although the assignment made Ocean an additional obligor under the DSAs, it did not release BP from any of its obligations. Consequently, the fact that BP transferred Plaintiff's deposit to Ocean is irrelevant because BP remains liable to Plaintiff under the DSAs if Ocean holds the deposit in

12

violation of the agreements.  BP's motion for summary judgment is therefore denied regarding this claim.

## IV. CONCLUSION

For the reasons discussed above, BP's motion for summary judgment is granted regarding Plaintiff's PMPA claim.  BP's motion for summary judgment regarding Plaintiff's breach-of-contract claims is denied to the extent BP seeks to dismiss Plaintiff's claim based on his unreturned $20,000 deposit.  Summary judgment is granted regarding Plaintiff's remaining breach-of-contract claims.  An appropriate order shall enter.


Dated: 11/18/10                                              /s/ Robert B. Kugler
                                                             ROBERT B. KUGLER
                                                             United States District Judge